## CHILDREN'S HOSPITAL OF DISTRICT OF COLUMBIA v. ADKINS et al., Minimum Wage Board.

## LYONS v. SAME.

(Court of Appeals of District of Columbia, February 14, 1921. Decided November 6, 1922.)

### Nos. 3438, 3467.

**1. Constitutional law ⊕⇒275(2)—Federal minimum wage law held unconstitutional.**

Act Cong. Sept. 19, 1918 (Comp. St. Ann. Supp. 1919, §§ 3421½a–3421½w), authorizing a board, after investigation, to fix the minimum wages for women who were employed in any occupation in the District of Columbia and were receiving inadequate wages, and prohibiting an appeal from a decision of this board, except on errors of law, and making it a penal offense for an employer to pay less than the minimum fixed to women who had not secured, under section 13 (Comp. St. § 3421½m), a certificate of impaired earning capacity, *held* violative of Const. U. S. Amends. 5 and 14, in view of the fact that this act was not passed to meet a temporary emergency.

**2. Injunction ⊕⇒85(2)—Violation of property right by enforcement of unconstitutional law may be restrained.**

Any attempt to enforce an unconstitutional law, resulting in an invasion of property rights, is subject to equitable restraint.

**3. Constitutional law ⊕⇒45—Legislative statement of facts inducing statute, and limitations on interpretation and appeal, held not conclusive on courts.**

The legislative statement of facts inducing an enactment, and limitations on interpretation and appeal, are not conclusive, since the courts will have the last word in the event of any arbitrary action.

**4. Constitutional law ⊕⇒276—Right to contract with relation to one's business protected by Fifth and Fourteenth Amendments.**

The right to contract in relation to one's business is part of the liberty of the individual, protected by Const. U. S. Amends. 5 and 14.

**5. Master and servant ⊕⇒69—Contracting for labor not a business impressed with a "public interest."**

Act Cong. Sept. 19, 1918 (Comp. St. Ann. Supp. 1919, §§ 3421½a–3421½w), fixing a minimum wage for women employed in the District of Columbia, cannot be upheld on the theory that the contracting for labor between private individuals is a business impressed with a "public interest."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Interest.]

**6. Constitutional law ⊕⇒48—Where Legislature has no power to act, recital of such power held without persuasive force.**

Where the Legislature has power to act, its exercise of this power will be accorded a favorable presumption; but, where there is a total lack of power, no jurisdiction is reposed in the Legislature to determine for itself the possession of the power, and a declaration to that effect is without persuasive force.

**7. Master and servant ⊕⇒69—Federal minimum wage law held invalid.**

Act Cong. Sept. 19, 1918 (Comp. St. Ann. Supp. 1919, §§ 3421½a–3421½w), providing for a minimum wage for women employed in the District of Columbia, is not a valid exercise of the police power.

Smyth, Chief Justice, dissenting.

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the Supreme Court of the District of Columbia.

Separate suits by the Children's Hospital of the District of Columbia and by Willie A. Lyons, each against Jesse C. Adkins and others, constituting the Minimum Wage Board of the District of Columbia. From decrees dismissing the bills, complainant in each case appeals. Reversed and remanded.

C. B. Ellis and Joseph W. Folk, both of Washington, D. C., for appellants.

F. H. Stephens, of Washington, D. C., and Felix Frankfurter, of Cambridge, Mass., for appellees.

VAN ORSDEL, Associate Justice. [1] These cases present the question of the constitutionality of the Minimum Wage Law of the District of Columbia. Act of Congress Sept. 19, 1918, 40 Stat. 960 (Comp. St. Ann. Supp. 1919, §§ 3421½a–3421½w).

By the act in question, the commissioners of the District of Columbia were authorized to appoint a minimum wage board, composed of three members. This board is vested with power, after investigation as provided in the statute, to fix the minimum wages to be paid women employees in any occupation in the District of Columbia, where the board from its investigation is of opinion that women workers are receiving inadequate wages. The act also provides that, after a minimum wage has been fixed, any employer or agent, or any officer, director, or agent of any corporation, refusing to comply with the order of the board, shall be guilty of a criminal offense, and upon conviction punished by fine or imprisonment, or both.

By a further provision of the act, the decision of the board, fixing a minimum wage, is made final, and no appeal to the courts from such decision is allowed except upon error of law. The board is given authority to examine the books of every individual or corporation, employing women in the District of Columbia, to ascertain the names of women employees and the wages paid, a register of which every employer is required to keep. It is made a criminal offense for any employer or his agent to discharge or discriminate in any manner against any employee who serves or is about to serve on any conference called by the board, or who has testified or is about to testify at any conference, or any employee whom the employer believes may serve on any conference or may testify "in any investigation or proceedings under or relative to this act."

Section 13 of the act (Comp. St. § 3421½m) provides:

"That for any occupation in which only a minimum time-rate wage has been established, the board may issue to a woman whose earning capacity has been impaired by age or otherwise, a special license authorizing her employment at such wage less than such minimum time-rate wage as shall be fixed by the board and stated in the license."

In case No. 3438, the Children's Hospital, a District of Columbia corporation, seeks to perpetually restrain the minimum wage board from enforcing an order requiring it to pay its women employees not less than $16.50 per week, or $71.50 per month. In case No. 3467, the

appellant, Willie A. Lyons, was operating an elevator in the Congress Hotel in the city of Washington, at a wage of $35 per month and two meals per day, when the board issued an order forbidding any hotel keeper to employ a woman or minor girl "at a rate of wages of less than 34½ cents per hour, $16.50 per week, or $71.50 per month." It is to restrain the enforcement of this order that appellant Lyons filed her bill in the court below.

From decrees of the Supreme Court of the District of Columbia, dismissing the bills, these appeals are prosecuted.

[2] We will not stop to analyze the records in these cases for the purpose of determining the sufficiency of the averments to sustain the prayers for extraordinary relief. The single question presented involves the power of Congress, in the light of the limitations of the Constitution of the United States, to enact this legislation. If the act is constitutional, unquestionably the averments are not sufficient to justify the interposition of equity; but any attempt to enforce an unconstitutional law, resulting in an invasion of property rights, is subject to equitable restraint. Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283. The constitutionality of the act is assailed upon the theory that the power exerted extends to the regulation and limitation of the freedom of contract between private individuals, and that it is the initial step toward unlimited federal price-fixing legislation.

[3] The act clearly was neither passed to meet a temporary emergency nor "to tide over a passing trouble." Its interpretation may be pursued without reference to the modern rule of emergency resorted to in support of certain so-called war legislation; nor does it appear that any situation has arisen in the District of Columbia, in respect of women workers, which has become so "publicly notorious" as to justify the inference of an emergency. True, Congress declared the purpose of the act to be "to protect the women and minors of the District from conditions detrimental to their health and morals resulting from wages which are inadequate to maintain decent standards of living." It then undertakes to direct the interpretation of the act and forbids appeal to the courts, except upon questions of law. While statements of fact by a Legislature, as an inducement for the enactment of a law, are entitled to respect, they are by no means conclusive upon the courts; nor are the limitations upon interpretation and appeal, since the courts will have the last word in the event of any arbitrary action on the part of the board in carrying out the provisions of the act.

Another contention may be disposed of in a word. True, a number of states have enacted similar laws, and they have generally been upheld by the state courts, but that by no means forecloses consideration of the present case. In Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960, the court condemned an act making it a criminal offense for an employer to prevent, by contract, his employees joining labor unions, notwithstanding such laws existed in 13 states and the territory of Porto Rico.

We are here called upon to weigh the subject-matter of certain leg-

islation in the balance of the Constitution, the general power of Congress to fix wage contracts between private individuals. If Congress may establish a minimum wage for women, it may establish a maximum wage, or it may name a fixed wage. If it may regulate wages for women, it may by the exercise of the same power establish the wages to be paid men. The power of Congress to fix wages between private individuals is either constitutional or unconstitutional. There is no leeway for legislative or judicial discretion. A fundamental principle is involved, and it does not lie in the courts to declare a law fixing the wages of women constitutional and a law fixing the wages of men unconstitutional. The moral stimulus in the one instance is no greater than in the other. If higher wages are essential to preserve the morals of women, they are equally essential to preserve the morals of men.

This leads to another angle. If the law is to be equitably enforced, it requires a most careful and judicious inquiry by the board into living conditions—the cost of rent, clothes, food, and recreation. If the power, therefore, exists to fix wages in the interest of good morals and the promotion of the general welfare, the power must likewise be conceded to fix the prices of all commodities entering into the determination of an equitable wage. In no other way can justice be accorded. The wage fixed for an employer to pay his employee cannot be justified, if based upon the unrestrained prices which the employee may have to pay the merchant for food and clothes, or the landlord for rent. The logical result of such a course relegates the whole matter of prices to the realm of legislation.

[4] The liberty protected by the Fifth and Fourteenth Amendments to the Constitution includes the freedom of contract and the right to contract with relation to one's business. "It is undoubtedly true, as more than once declared by this court, that the general right to contract in relation to one's business is part of the liberty of the individual, protected by the Fourteenth Amendment." Muller v. Oregon, 208 U. S. 412, 421, 28 Sup. Ct. 324, 326 (52 L. Ed. 551, 13 Ann. Cas. 957). In Coppage v. Kansas, 236 U. S. 1, 14, 35 Sup. Ct. 240, 243 (59 L. Ed. 441, L. R. A. 1915C, 960), the court, affirming the doctrine announced in the Muller Case, said:

"The principle is fundamental and vital. Included in the right of personal liberty and the right of private property—partaking of the nature of each— is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money."

The public safety and welfare may justify the Legislature in limiting the hours of labor in mines and other hazardous industries, and require safeguards to be employed in conducting dangerous occupations. Such regulations, however, affect only the mode of operation, and do not invade the domain of prices. They are easily distinguished from the purely economic question of how much the employer shall

pay the employee for his services. In one case the business conducted is so inherently dangerous that its regulation, as to methods of operation, becomes a valid exercise of the police power. The public health and safety demand, not that the business be confiscated, not that proprietorship therein be curtailed or limited, not that the economic control thereof may be in the least affected, but that the business be so conducted that the public health and safety may not be seriously endangered.

Legislation tending to fix the prices at which private property shall be sold, whether it be a commodity or labor, places a limitation upon the distribution of wealth, and is aimed at the correction of the inequalities of fortune which are inevitable under our form of government, due to personal liberty and the private ownership of property. These principles are embodied in the Constitution itself, and to interfere with their freedom of operation is to deprive the citizen of his constitutional rights. In other words, regardless of public sentiment or popular demand, such a radical change, if deemed necessary, should not be accomplished by legislative enactment or judicial interpretation, but by way of amendment in the orderly way provided.

Alexander Hamilton, whose keen vision seems to have forecast the dangers that would arise in the future, threatening the stability and the life of the republic, left a timely warning against attempted legislative or judicial amendment in response to public clamor. He declared it to be a—

"fundamental principle of republican government, which admits the right of the people to alter or abolish the established Constitution, whenever they find it inconsistent with their happiness, yet it is not to be inferred from this principle that the representatives of the people, whenever a momentary inclination happens to lay hold of a majority of their constituents, incompatible with the provisions in the existing Constitution, would, on that account, be justifiable in a violation of those provisions; or that the courts would be under a greater obligation to connive at infractions in this shape than when they had proceeded wholly from the cabals of the representative body. Until the people have, by some solemn and authoritative act, annulled or changed the established form, it is binding upon themselves collectively, as well as individually; and no presumption, or even knowledge, of their sentiments, can warrant their representatives in a departure from it, prior to such an act. But it is easy to see that it would require an uncommon portion of fortitude in the judges to do their duty as faithful guardians of the Constitution, where legislative invasions of it had been instigated by the major voice of the community." The Federalist, c. 78.

The police power cannot be employed to level inequalities of fortune. Private property cannot by mere legislative or judicial fiat be taken from one person and delivered to another, which is the logical result of price fixing. As was said by Mr. Justice Pitney, in the Coppage Case:

"But the Fourteenth Amendment, in declaring that a state shall not 'deprive any person of life, liberty or property without due process of law,' gives to each of these an equal sanction: it recognizes 'liberty' and 'property' as coexistent human rights, and debars the states from any unwarranted interference with either. And since a state may not strike them down directly it is clear that it may not do so indirectly, as by declaring in effect that the public

good requires the removal of those inequalities that are but the normal and inevitable result of their exercise, and then invoking the police power in order to remove the inequalities, without other object in view. The police power is broad, and not easily defined, but it cannot be given the wide scope that is here asserted for it, without in effect nullifying the constitutional guaranty."

In Frisby v. United States, 157 U. S. 160, 166, 15 Sup. Ct. 586, 588 (39 L. Ed. 657), the court, after reviewing a number of instances in which the police power had been validly exercised, made the following pertinent exception:

"The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

But it is suggested that the act may be sustained, since Congress is legislating for a class. The constitutional limitations upon Congress involve fundamental principles of human rights reserved to the whole people and not to any favored class of citizenship. They are for the protection alike of the rich and the poor, the strong and the weak, the high and the low, and may not, either by legislative or judicial fiat, be used to extend special protection or privileges to any particular class of citizens. No reason is apparent why the operation of the law should be extended to women to the exclusion of men, since women have been accorded full equality with men in the commercial and political world. Indeed, this equality in law has been sanctioned by constitutional amendment; and so fixed has the tendency in this direction become established in English-speaking lands, that the opportunity for official and business preferment, upon complete equality with men, is limited only by the scope of her aspirations.

The right of Willie Lyons to contract her labor in any lawful calling is a property right, of which, if the property clauses of the Constitution mean anything, she cannot be deprived. When the minimum wage of $71.50 per month for women was fixed by the board in this district, Willie Lyons was operating an elevator in the Congress Hotel at a wage of $35 per month and two meals per day. As a result she lost her position. The law worked but one way. The hotel manager was not compelled to employ her at a fixed wage, and her position went to a man, who was willing to perform the service at a lower wage than that fixed by the board. She was without the power to compel her employment, and, because of her inability to measure up to the minimum scale, the law to promote the good morals and general welfare of the community cast her adrift. She was not even in position to avail herself of the provisions of section 13 of the act, since she was fully qualified to perform the work for which she was employed. Her earning capacity as an elevator operator was not "impaired by age or otherwise." The only way, therefore, by which she could have been saved from competitive injury, would have been to have fixed the minimum wage of elevator operators at $32.50 per month and two meals per day. Unless, therefore, the board is to be accorded arbitrary power, section 13 has no application to her case.

The sacredness of the right of the citizen to freely contract his labor

was upheld in Adair v. United States, 208 U. S. 161, 174, 28 Sup. Ct. 277, 280 (52 L. Ed. 436, 13 Ann. Cas. 764), where the court, speaking through Mr. Justice Harlan, said:

"The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. * * * In all such particulars the employer and the employee have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land."

We come now to the consideration of two recent cases upon which counsel for appellees chiefly rely. In Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, known as the Adamson Law Case, the court was considering a statute establishing an eight-hour working day for railway employees on interstate railroads, and incidentally providing that the then existing scale of wages should be continued in force until the parties could agree. The court clearly pointed out that the law constituted a regulation of a business impressed with a public interest. It affected an instrumentality of interstate commerce, the control of which is expressly reserved to Congress in the Constitution. The court held that Congress not only had power to legislate for the protection of the public interest in keeping open the channels of commerce, but possessed authority to regulate matters incidental to the proper exercise of that power. In upholding the provisions of the act continuing the wage scale in force until the parties could agree, the court said:

"And this emphasizes that there is no question here of purely private right since the law is concerned only with those who are engaged in a business charged with a public interest where the subject dealt with as to all the parties is one involved in that business and which we have seen comes under the control of the right to regulate to the extent that the power to do so is appropriate or relevant to the business regulated."

In no respect did the court even intimate that the power of Congress to fix wages for railway employees could be invoked, except where, through failure of agreement, commerce is jeopardized. The authority of Congress is expressed in the opinion in a single sentence:

"Here again it is obvious that what we have previously said is applicable and decisive, since whatever would be the right of an employee engaged in a private business to demand such wages as he desires, to leave the employment if he does not get them and by concert of action to agree with others to leave upon the same condition, such rights are necessarily subject to limitation when employment is accepted in a business charged with a public interest and as to which the power to regulate commerce possessed by Congress applied and the resulting right to fix in case of disagreement and dispute a standard of wages as we have seen necessarily obtained."

The Adamson Law (Comp. St. §§ 8680a–8680d) was not a wage-fixing statute and the court so held. The power of Congress to continue the wage scale in force was limited to its power to legislate generally in respect of commerce, and to the failure of the parties to agree upon a satisfactory scale of wages. In no place is it intimated

that Congress, even in the exercise of its delegated authority to regulate commerce, would have power to legislate upon the question of wages where an agreed scale existed.

In Block v. Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, involving the validity of the Ball Rent Act for the District of Columbia (41 Stat. 298), the court held the renting of property in the District of Columbia, under existing conditions, to be a business affected with a public interest. The act, however, was upheld only upon the theory that the power to fix rentals is limited to an existing emergency. The act was held to be a temporary measure, "made necessary by emergencies growing out of the war * * * embarrassing the federal government in the transaction of the public business." This act was passed to correct an abuse which had become "publicly notorious," and the emergency which had made this condition possible was held to justify the act. "The regulation is put and justified only as a temporary measure. See Wilson v. New, 243 U. S. 332, 345, 346; Ft. Smith & Western R. R. Co. v. Mills, 253 U. S. 206. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."

In the recent decision of the Supreme Court of the United States, Edgar A. Levy Leasing Co., Inc., v. Jerome Siegel, 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. ——, upholding the New York Rent Law, the court, placing its decision upon the same basis as in the Hirsh Case, said:

"In terms the acts involved are 'emergency' statutes, and, designed as they were by the Legislature to promote the health, morality, comfort and peace of the people of the state, they are obviously a resort to the police power to promote the public welfare. They are a consistent interrelated group of acts essential to accomplish their professed purposes. The warrant for this legislative resort to the police power was the conviction on the part of the state legislators that there existed in the larger cities of the state a social emergency, caused by an insufficient supply of dwelling houses and apartments, so grave that it constituted a serious menace to the health, morality, comfort, and even to the peace of a large part of the people of the state. That such an emergency, if it really existed, would sustain a resort, otherwise valid, to the police power for the purpose of dealing with it, cannot be doubted, for, unless relieved, the public welfare would suffer in respects which constitute the primary and undisputed, as well as the most usual basis and justification, for exercise of that power."

[5] We are of the opinion that the act cannot be upheld upon the theory that the contracting for labor between private individuals is a business impressed with a public interest. Unlike the operation of an elevator to handle indiscriminately the grain of the public and the rates to be charged for such service (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77), or the trust relation arising from the depositing of funds in banks (Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487), or the rates to be charged the public by insurance companies (German Alliance Insurance Co. v. Kansas, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189), we are here dealing with a private business, conducted between private individuals, in which the public has no direct economic interest. It follows, therefore, that if the doc-

trine of "public interest," is to be extended to the point of fixing by law the rate at which the individual citizen may contract his labor, by placing a limitation upon the freedom of private contract between employer and employee, it is difficult to understand just where the limitations of the extension of police power may be reached. It amounts to converting the police power into a convenient experimental agency for distinguishing, extending, or abrogating express limitations of the Constitution.

[6] The difficulty arises, we think, from the failure to distinguish between legislative discretion and legislative power. A mere declaration of necessity assumes the existence of power to act, and where there is power, legislative discretion, in its exercise, will be accorded favorable presumption; but, if there is a total lack of power, no jurisdiction is reposed in the Legislature to determine for itself the possession of the power, and a declaration to that effect is without persuasive force. As the court said, in Truax v. Raich, supra:

"We have frequently said that the Legislature may recognize degrees of evil and adapt its legislation accordingly, * * * but underlying the classification is the authority to deal with that at which the legislation is aimed."

We are here dealing with the power of Congress to restrict freedom of contract which is expressly guaranteed in the Constitution. In the Coppage Case, the court held that—

"The mere restriction of liberty or of property rights cannot of itself be denominated 'public welfare,' and treated as a legitimate object of the police power; for such restriction is the very thing that is inhibited by the [Fourteenth] Amendment."

[7] Coming now to the consideration of the vindication of the act as a proper exercise of the police power, we are of the opinion that it cannot be upheld. High wages do not necessarily tend to good morals, or the promotion of the general welfare. The standard of virtue and morality is no higher among the prosperous than among the poor. Their worth cannot be measured in dollars and cents, or promoted by a legal subsidy. Never have wages been so high as since the outbreak of the late war, and never in the history of the republic has crime been so universal; and this condition, it must be conceded, has made a like unfavorable impression upon the morals of the people. A wage based upon competitive ability is just, and leads to frugality and honest industry, and inspires an ambition to attain the highest possible efficiency, while the equal wage paralyzes ambition and promotes prodigality and indolence. It takes away the strongest incentive to human labor, thrift, and efficiency, and works injustice to employee and employer alike, thus affecting injuriously the whole social and industrial fabric. Experience has demonstrated that a fixed minimum wage means, in the last analysis, a fixed wage; since the employer, being compelled to advance some to a wage higher than their earning capacity, will, to equalize the cost of operation, lower the wage of the more competent to the common basis.

Any intimation that the Constitution is flexible, even in response to the police power, is unsound. Powers expressly delegated by the Con-

stitution—such, for example, as the regulation of interstate commerce —may be extended to meet changing conditions, providing it can be accomplished without altering fundamental principles; but the principles are immutable, not elastic, or subject to change. That a state may not impair the obligations of a contract, or that no person can be deprived of his property without due process of law, are principles fundamental, and if the Legislature, in response to public clamor for an experimental social reform, may break down these constitutional guaranties by calling an act a "health law," or a "public morality law," or a "public welfare law," all guaranties of the Constitution, under the alleged exercise of the police power, may be changed, modified, or totally eliminated.

Nor is the extent of such modification a matter of judicial discretion. To hold that the courts may declare a law, violating the same principle, constitutional under one state of fact, and unconstitutional under another, is the exercise of arbitrary power—a power said to exist nowhere in our system of government. And nowhere could it be lodged with more dangerous results than in the courts.

The tendency of the times to socialize property rights under the subterfuge of police regulation is dangerous, and if continued will prove destructive of our free institutions. It should be remembered that of the three fundamental principles which underlie government, and for which government exists, the protection of life, liberty, and property, the chief of these is property; not that any amount of property is more valuable than the life or liberty of the citizen, but the history of civilization proves that, when the citizen is deprived of the free use and enjoyment of his property, anarchy and revolution follow, and life and liberty are without protection.

The highest freedom consists in obedience to law, and a strict adherence to the limitations of the Constitution. In no way can the freedom of the citizen be more effectively curtailed and ultimately destroyed than by a deprivation of those inherent rights safeguarded by our fundamental law. The security of society depends upon the extent of the protection afforded the individual citizen under the Constitution against the demands and incursions of the government. The only tyranny the citizenship of this republic need fear is from the government itself. The character and value of government is measured by the security which surrounds the individual in the use and enjoyment of his property. These rights will only remain secure so long as the Bill of Rights—the first ten amendments of the Constitution—are construed liberally in favor of the individual and strictly against the government. They were early adopted because of a widespread apprehension that the time might come when the government would assume to trespass upon those inalienable individual rights announced in the Declaration of Independence and afterwards incorporated in the Bill of Rights. Courts, therefore, should be slow to lend aid to the government in this modern tendency to invade individual property rights.

"Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of

procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis." Boyd v. United States, 116 U. S. 616, 635, 6 Sup. Ct. 524, 535 (29 L. Ed. 746).

No greater calamity could befall the wage-earners of this country than to have the legislative power to fix wages upheld. It would deprive them of the most sacred safeguard which the Constitution affords. .Take from the citizen the right to freely contract and sell his labor for the highest wage which his individual skill and efficiency will command, and the laborer would be reduced to an automaton—a mere creature of the state. It is paternalism in the highest degree, and the struggle of the centuries to establish the principle that the state exists for the citizen, and not the citizen for the state, would be lost.

If, in the exercise of the police power for the general welfare, power lies in the Legislature to fix the wage which the citizen must accept, or choose idleness, or, as in the case of Willie Lyons, be deprived of the means of earning a living, it is but a step to a legal requirement that the industrious, frugal, economical citizen must divide his earnings with his indolent, worthless neighbor. The modern tendency toward indiscriminate legislative and judicial jugglery with great fundamental principles of free government, whereby property rights are being curtailed and destroyed, logically will, if persisted in, end in social disorder and revolution. Let no one imagine for a moment that our civilization is such that property rights can thus be socialized without the grossest abuse of the privileges granted, or that the restraint of the abuses can be left with safety to legislative or judicial discretion.

The decrees are reversed, with costs, and the causes remanded for further proceedings, not inconsistent with this opinion.

SMYTH, Chief Justice (dissenting). Before discussing the constitutionality of the act, it is necessary to consider matters not referred to in the majority opinion, and which are essential to a correct disposition of the cases. These cases were decided on the 6th day of June, 1921, and motions for rehearing denied on June 22 of the same year. In my opinion both cases were finally disposed of then, and the court is without jurisdiction to render the present decisions.

At the time the causes were first called for hearing, Mr. Justice Robb was unable to sit in them because of illness. Pursuant to section 225 of the District of Columbia Code, the other justices designated Mr. Justice Stafford of the Supreme Court to take his place. The order designating him provided that he should "sit as a member of this court in the absence of Mr. Justice Robb in the hearing and decision of the following cases," among which were those now under consideration. Mr. Justice Stafford took his seat on the bench, participated in the hearing of the cases, in their consideration and final disposition by the court. On June 6 the court sustained the constitutionality of the act,

and affirmed the decrees of the trial court. The opinion was by the Chief Justice, Mr. Justice Stafford announcing a short concurring opinion and Mr. Justice Van Orsdel dissenting. A motion for rehearing in each case was filed by the appellants on June 14, and on June 22, was considered and overruled by a majority of the court, consisting of the Chief Justice and Mr. Justice Stafford, Mr. Justice Van Orsdel being absent. Section 225 of the Code provides that, where one member of the court is absent or disqualified, a majority may rule on motions. At the time the motions for rehearing were overruled, an order was made that the mandates be withheld until the appellants had a reasonable opportunity to apply to the Supreme Court of the United States for a review. About this time the members of the court separated for the summer vacation. The motions for rehearing did not challenge in any way the right of Mr. Justice Stafford to participate in the disposition of them, and the question as to his right to do so was not before the Chief Justice and Mr. Justice Stafford at the time they overruled the motions, and never was submitted to them, nor had any member of the court been asked to pass on it prior to the overruling of the motions, so far as I know.

June 25, three days after the motions for rehearing had been overruled, Mr. Justice Robb wrote to the Chief Justice as follows:

"Within fifteen days after the decision was announced in the minimum wage cases, counsel sent me their application for a rehearing, and insisted, and still insist, that I vote thereon. While I incline to the view that Justice Stafford no longer has any jurisdiction in these cases, I wish to look up the authorities, if any there be, before deciding definitely."

In answer the Chief Justice said the motions had already been passed upon, and he ventured to suggest reasons which then occurred to him for believing that Justice Stafford had acted within his authority when he united with the Chief Justice in overruling the motions. To this no answer was made, but on July 1 Justice Robb wrote, saying:

"After mature consideration, I have decided to vote for a rehearing in the minimum wage cases, and I am advising counsel to that effect, as well as Justice Van Orsdel."

Thereafter, in pursuance of directions from him and Mr. Justice Van Orsdel, the clerk entered an order granting a rehearing in both cases, the Chief Justice dissenting.

About ten days after Mr. Justice Robb had notified the Chief Justice of his intention to vote, motions were filed to set aside the order made by Justice Stafford and the Chief Justice. These motions were based upon the ground that the order was not passed by a majority of the court as constituted at the time the order was made. This was the first time the right of Justice Stafford was questioned by any pleading or other paper filed in the cases, or by any other method addressed to the court. These motions were sustained July 13, Mr. Justice Robb and Mr. Justice Van Orsdel concurring, and the Chief Justice dissenting.

It would seem from the foregoing that the appellants, finding themselves defeated, sought a justice who had not sat in the case, but who, they believed, would be favorable to them, and induced him, by an

appeal directed to him personally, to assume jurisdiction and join with the dissenting justice in an attempt to overrule the decisions of the court. I shall not characterize such practice; let the facts speak for themselves.

What arguments, if any, were advanced to Mr. Justice Robb by counsel for appellants, when they made their application to him, I do not know; nor am I aware of the basis on which he rested his conclusion that he had a right to vote on the motions. But, from what I have said, it is manifest, I think, that he proceeded upon the assumption that he alone had the power to decide the question; in other words, that it was not a matter for consideration by the court. I am unable to agree to this. Whether or not he had such power involved a construction of the Code authorizing the calling in of a substitute justice. Of course, where the question is as to whether or not a judge is prejudiced against one of the parties, or interested in the subject of the litigation, it is usual for him to decide the matter for himself, except in cases controlled by section 20 of the Judicial Code (Comp. St. § 987). But the question here involved relates, not only to the power of Justice Robb, but also to that of Justice Stafford. Acting by virtue of the statute, two members of this court had designated Justice Stafford to sit "in the hearing and decision of these cases," which, of course, included the disposition of the motions for rehearing, for the cases would not be decided finally until those matters were ruled upon. Mr. Justice Robb attempted to set aside that order and displace Justice Stafford. I submit he was without power to do so. The question was for the court, not for one member of it only.

But had Justice Stafford jurisdiction of the cases when he voted on the motions? The Code section to which reference has already been made provides that the substitute justice shall temporarily fill the vacancy created by the absence of the regular justice and shall sit in the court "and perform the duties of a member thereof while such vacancy or vacancies shall exist." When does the vacancy cease to exist? When the regular justice is able to return to his duties, when he actually does so, or when the substitute justice has completed the work which he had properly entered upon before the return of the regular justice? It seems to me the latter must be the time. Unless this view is taken, great inconvenience would follow, and the business of the court would be much retarded. Suppose that, at the time the regular justice returns to the court, the substitute justice had participated in the hearing of 25 cases then under advisement, can it be that his authority to further act, so far as those cases are concerned, had come to an end? If so, the cases would have to be restored to the docket for reargument before a court comprising the three regular members. I do not believe the act means this. My opinion is that, while the substitute justice may not enter upon any new work after the return of the regular justice, he has the authority, and it is his duty, to complete the work undertaken while the regular member of the court was absent. This has been the practice, without a single exception, save the present case, since the organization of the court. Shore v. Splain, 49 App. D. C. 6, 258 Fed. 150. After the motions for rehearing were granted in

284 F.—40

these cases, Mr. Justice Robb refused to consider a motion for rehearing in a case in which he had not sat (Clement v. Roberts, 51 App. D. C. 29, 273 Fed. 757), and it was necessary to send for Mr. Justice Hitz, who took part in the hearing and decision of the case, to vote on the motion; there being a division of opinion among the other justices. At this moment a substitute justice is considering cases in the hearing of which he participated, though the justice whose place he took has returned to the court and is engaged in the discharge of his duties.

Recently the court, after a very careful consideration of the authorities, unanimously decided a similar question (Shore v. Splain, supra), and the ruling is in accordance with the views I have just expressed. An act of Congress approved February 17, 1909 (35 Stat. 624, c. 134), authorized the Chief Justice of the Supreme Court of the District to designate a judge of the municipal court to sit in the police court during the "sickness, absence, or disability" of one of the regular judges. A judge designated pursuant to this act tried a criminal case. The defendant, having been convicted, moved for a new trial. The judge took the motion under advisement, and some time later, after the regular judge had returned and taken his seat on the bench, overruled the motion and sentenced the defendant. It was contended that he had no power to do so, and a writ of habeas corpus was sought to test the question. In rejecting the contention we said:

"It was undoubtedly the intention of Congress in providing for a temporary judge that he should perform the duties of the position during his incumbency and complete any work entered upon by him before he withdrew from the place; otherwise, as in the case of a trial, much of his effort might come to naught if the return to duty of the regular judge had the effect of terminating his authority, and thus the purpose of Congress in providing for a substitute judge would be defeated in many cases."

To support our views of the law we cited State v. Stevenson, 64 W. Va. 392, 62 S. E. 688, 19 L. R. A. (N. S.) 713; State v. Bobbitt, 215 Mo. 10, 30, 114 S. W. 511; Bohannon v. Tabbin (Ky.) 76 S. W. 46, 49; Bedford v. Stone, 43 Tex. Civ. App. 200, 95 S. W. 1086; State ex rel. v. Williams, 136 Mo. App. 330, 336, 117 S. W. 618; Mayer v. Haggerty, 138 Ind. 628, 38 N. E. 42, and Fisher v. Puget Sound Brick, etc., Co., 34 Wash. 578, 76 Pac. 107.

In State v. Stevenson, a criminal case involving the death sentence, the defendant pleaded guilty before a special judge, who took time thereafter to consider of his judgment. While he was doing so the regular judge returned, assumed the bench, and sentenced the prisoner. The statute under which the special judge was appointed provided that he should serve in the absence of the regular judge. It was argued that, the moment the regular judge appeared, the authority of the special judge ceased; therefore that the sentence by the regular judge was valid. But the court, after reviewing the decisions of its own state and those of other states upon the question, ruled:

"That the return of the regular judge would not oust the special judge of jurisdiction to try and finally dispose of any case begun before him."

The court in Bohannon v. Tabbin expressed a like view. It said:

"The fact that the regular judge returned before the case was finally disposed of by the special judge in no wise nullified the jurisdiction of the latter. It would create inextricable confusion if, after a special judge, elected because of the absence of the regular judge, had commenced the trial of a case, his jurisdiction to further try it should be ousted by the return of the regular judge. It needs no argument to demonstrate the hardship and expense to litigants which would arise upon the adoption of such a principle."

In addition to the authorities cited in the Shore Case, the following are pertinent: Dupoyster v. Clarke, 121 Ky. 694, 90 S. W. 1; State v. Tomlinson, 7 N. D. 294, 74 N. W. 995; State v. Towndrow, 25 N. M. 203, 180 Pac. 282; State ex rel. v. Williams et al., 136 Mo. App. 330, 117 S. W. 618, 620; Johnson v. State, 1 Okl. Cr. 321, 97 Pac. 1059, 1064, 18 Ann. Cas. 300. In State ex rel. v. Williams et al. the court said that, the substitute judge having tried the case, "his jurisdiction and authority over it continued until the motions consequent upon the trial were disposed of."

Cases where a judge's term of office had expired and his successor acted upon unfinished business, or where a special judge withdrew leaving work to be done, have no application. In such cases public policy required that the unfinished work be disposed of; but here no question of that kind existed, for Justice Stafford had completed the work for which he had been assigned before Mr. Justice Robb had decided to act. The Shore Case is directly in point. Why was it not followed? No explanation is offered. If we are not to respect our own decisions, their publication is an idle ceremony, and must have a tendency to mislead the profession.

Under the Organic Act (27 Stat. 434) this court consists of only three judges. No litigant has a right to have his case adjudged by a greater number; but the appellants, by the projection of Mr. Justice Robb into the case, have secured the judgment of four judges. There is no authority in the statute for such a thing. Considering the law, then, as it is, I am convinced that Mr. Justice Stafford's authority continued until the motions for rehearing had been disposed of, that both cases were finally adjudicated on June 22, 1921, and that the court has no jurisdiction over them at this time.

In discussing the constitutionality of the act, I shall repeat in substance what I said in the opinion of the court when these cases were adjudicated in June, 1921, making only such changes as shall be necessary to conform to the present situation. I shall also utilize the argument made by Mr. Justice Stafford in his concurring opinion.

The question presented by these cases is not one of economics. It does not call for a decision with respect to what constitutes thrift or lack of thrift. Nor is the wisdom or nonwisdom of the statute before the court. It is no part of our function to deal with such matters, and any discussion of them is quite beside the case. Our authority is limited to the single question: Had Congress the right to pass the act? When we decide that we decide everything we have any right to touch. All else that is said, no matter how vehemently, is merely obiter.

The act provides, not only for what is said in the statement of facts by the majority, but also for the protection of "women and minors of the District from conditions detrimental to their health and morals, resulting from wages which are inadequate to maintain decent standards of living," and emphatically directs that it shall be interpreted to effectuate this purpose. It also provides that all parties interested are entitled to be heard before the board; that witnesses may be summoned, and the aid of the courts invoked for the purpose of compelling their attendance; that after the prescribed investigation has taken place it shall be the duty of the board to declare standards of minimum wages for the women in the occupations investigated and "what wages are inadequate to supply the necessary cost of living to any such women workers to maintain them in good health and to protect their morals," and also to determine like standards for minors and what wages are unreasonably low for any such minor workers.

The board having in the manner provided by the act investigated the conditions of women and minor girls employed by hotels, lodging houses, apartment houses, clubs, restaurants, cafeterias, and hospitals, and the wages paid to them in these establishments, issued an order forbidding, among other things, any person or corporation to employ a woman or minor girl in any of these places "at a rate of wages of less than 34½ cents per hour, $16.50 per week, or $71.50 per month," but providing that, where bona fide meals are furnished as part payment of wages, not more than 30 cents per meal may be deducted from the weekly wages.

Appellant in No. 3438 does not deny the reasonableness of the wage established by the board. If its employés were not able, because of age or of anything else, to earn that wage, it could have procured permission under section 13 of the act to employ them for less; but it made no application for this permission. Its argument is, as we understand it, that since its employés are willing to work for a smaller wage —a wage less than is necessary to sustain them in good health according to the findings of the board—it has a right to contract with them on that basis; and because the act deprives it of that right it interferes with its liberty of contract and thereby deprives it of its property without due process. In other words, it argues that Congress has no power to fix any wage, reasonable or unreasonable, for women and minors, even if it be absolutely necessary to do so in order that the health and morals of its employés may be preserved. Appellant in No. 3467 makes the same contention, so far as it applies to her.

It is now firmly established, so often has it been decided, that the high respect due from one co-ordinate branch of the government to another forbids the judiciary to declare an act of Congress invalid unless it is manifestly so. "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." Sinking-Fund Cases, 99 U. S. 700, 718 (25 L. Ed. 496).

Mr. Justice Holmes, speaking for the court in Otis v. Parker, 187 U. S. 606, 608, 609, 23 Sup. Ct. 168, 170 (47 L. Ed. 323), said:

"While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can, know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held semper ubique et ab omnibus."

Supporting the same views are Rast v. Van Deman & Lewis Co., 240 U. S. 342, 366, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455, United States v. Cohen Grocery Co., 255 U. S. 81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, Patterson v. Kentucky, 97 U. S. 501, 503, 24 L. Ed. 1115, and Louisiana v. Jumel, 107 U. S. 711, 767, 2 Sup. Ct. 128, 27 L. Ed. 448.

It is true, as Dean Pound says, that the theory in some courts that statutes will not be held unconstitutional unless their repugnance to the Constitution is beyond doubt has become "a mere courteous and smoothly transmitted platitude, and is worse than an anachronism." The Spirit of the Common Law, by Roscoe Pound, p. 108. It is not so, however, in the Supreme Court of the United States, as the decisions just referred to demonstrate. Since, then, "every possible presumption" is in favor of the legality of a statute, he who attacks it has the very heavy burden, if he would succeed, of establishing its invalidity beyond a reasonable doubt. This must be kept in mind throughout our discussion.

As we have just seen, the position of the appellants is that under no conceivable state of facts would Congress have the power to pass a minimum wage act. This must be their position, for, if they admitted that under any state of facts Congress possessed that power, we would have to assume that these facts existed when the present act was passed. Such is the doctrine of Munn v. Illinois, 94 U. S. 113, 132 (24 L. Ed. 77), wherein it is said:

"For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state. But if it could, we must presume it did."

That principle has often been assailed, but the court has steadily refused to recede from it in any respect. Some of the cases which illustrate this are Ga. R. & Banking Co. v. Smith, 128 U. S. 174, 180, 9 Sup. Ct. 47, 32 L. Ed. 377; Budd v. New York, 143 U. S. 517, 543, 12 Sup. Ct. 468, 36 L. Ed. 247; German Alliance Ins. Co. v. Kansas, 233 U. S. 409, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323. In the Kansas Case I find this:

"Munn v. Illinois was approved in many state decisions, but it was brought to the review of this court in Budd v. New York, 143 U. S. 517, and this doctrine, after elaborate consideration, reaffirmed, and against the same arguments which are now urged against the Kansas statute."

When Congress legislates for the District of Columbia it may exercise the police power in all its plenitude. Washington Terminal Co. v. District of Columbia, 36 App. D. C. 186, 191; District of Columbia v. Brooke, 214 U. S. 138, 149, 29 Sup. Ct. 560, 53 L. Ed. 941. About this there is no dispute. Under that power it has the right "to enact laws for the promotion of the health, safety, morals, and welfare of those subject to its jurisdiction." Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U. S. 549, 568, 31 Sup. Ct. 259, 262 (55 L. Ed. 328). See also the case of Block v. Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165.

Does this act fall within the power? The Congress by enacting it says it does. "Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature?" Jacobson v. Massachusetts, 197 U. S. 11, 31, 25 Sup. Ct. 358, 363 (49 L. Ed. 643, 3 Ann. Cas. 765). It can be done only where "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law. * * *" Mugler v. Kansas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 297 (31 L. Ed. 205). See also Minnesota v. Barber, 136 U. S. 313, 320, 10 Sup. Ct. 862, 34 L. Ed. 455, and Atkin v. Kansas, 191 U. S. 207, 223, 24 Sup. Ct. 124, 48 L. Ed. 148. This doctrine was reasserted in Levy Leasing Co., Inc., v. Siegel, 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. ——, and in Stafford et al. v. Wallace, 258 U. S. ——, 42 Sup. Ct. 397, 66 L. Ed. ——.

In the former it was held that the reports of committees appointed by New York officials to investigate the housing situation, "and the very great respect which courts must give to the legislative declaration that an emergency existed, would be amply sufficient to sustain an appropriate resort to the police power for the purpose of dealing with it in the public interest." In the Stafford Case, the court, speaking through the Chief Justice, declared that "it is primarily for Congress to consider and decide the fact of the danger and meet it," and added:

"This court will certainly not substitute its judgment for that of Congress in such a matter, unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent."

I first inquire whether or not the act has any real or substantial relation to its declared object. For answer I may resort to our common knowledge. "A common belief; like common knowledge, does not require evidence to establish its existence, but may be acted upon without proof by the legislature and the courts. * * * The fact that the belief is not universal is not controlling for there is scarcely any belief that is accepted by every one." In re Viemeister, 179 N. Y. 235, 240, 72 N. E. 97, 99 (70 L. R. A. 796, 103 Am. St. Rep. 859, 1 Ann. Cas. 334), approved in Jacobson v. Massachusetts, supra, 197

U. S. 34, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765. To the same effect is McNichols v. Pease, 207 U. S. 100, 111, 28 Sup. Ct. 58, 52 L. Ed. 121. "We think," says the Supreme Court, "that the trial court might well take judicial notice that the public health is deeply concerned in the reclamation of swamp and overflowed lands. If there is any fact which may be supposed to be known by everybody, and, therefore, by courts, it is that swamps and stagnant waters are the cause of malarial and malignant fevers, and that the police power is never more legitimately exercised than in removing such nuisances." Leovy v. United States, 177 U. S. 621, 636, 20 Sup. Ct. 797, 803 (44 L. Ed. 914). It is equally well known that, if a working woman does not receive a sufficient wage to supply her with necessary food, shelter, and clothing, and she is compelled to subsist upon less than her requirements demand, the result must be that her health will be injuriously affected.

Congress did not pass the act until it had thoroughly investigated the subject involved. I glean the following from the House Committee's reports: The Department of Labor interviewed 600 women workers and laid the results of its efforts before the committee. About half of the 600, it was shown, earned less than $8 per week, and over two-thirds less than $10 a week. This situation was not owing to their youth and inexperience, for 72 per cent. were 21 years of age or older, and one-half of those earning less than $9 per week had been at work for 5 years and more. The least for which the average woman could obtain board and lodging in the District was $35 per month. Sufficient clothing, "even with the strictest economy," could not be obtained for less than $88 per year. Nearly 42 per cent. of the 600 women interviewed spent less than that on clothing. To be well dressed, but not extravagantly, a woman must spend approximately $125 per year, and 68 per cent. of the women interviewed spent less than that amount. In the lowest paid groups of workers the average expenditure for clothing, says the report, "is below that which would permit of physical comfort and decency." Of the 600 interviewed, "45 per cent. needed to receive outside assistance in order to make both ends meet." The Merchants' & Manufacturers' Association of the District, representing 33 different businesses and employing about 5,000 persons, made known to the committee that it approved the bill. No one appeared to oppose it. The committee said that the remedy provided by the bill had been tried and found successful in various states of the Union and in other parts of the English-speaking world, and concluded:

"That inadequacy of wages means either of two things: * * * Inadequacy of all the essentials—shelter, clothing, food, etc., with resultant impoverishment of health, or * * * that from some source the wage must be supplemented with possible resort to wrongdoing."

As was said in Stafford v. Wallace, supra:

"It was for Congress to decide, from its general information and from such special evidence as was brought before it, the nature of the evils actually present or threatening, and to take such steps by legislation within its power as it deemed proper to remedy them."

According to the congressional decision, women and minor workers in the District were paid inadequate wages, and this had a tendency to affect injuriously their health and morals.

Thirteen states of the Union, either by a statute or a constitutional provision, and Argentina, France, Great Britain, Norway, Austria, and eight provinces of Canada, by legislative acts, have provided for a minimum wage for women on the theory that it tends to safeguard their health. Students of the subject and public boards in different parts of the world have found and declared as a result of thorough investigation that minimum wage stimulates industrial efficiency and aids industrial peace, and the experience of other countries may be considered by Congress in enacting such legislation as this. Muller v. Oregon, 208 U. S. 412, 419, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957. This shows that in the judgment of a large part of the world there is an intimate relation between a minimum wage and the public welfare.

Minimum wage statutes have been assailed several times in the courts, but no court has held one invalid. Stettler v. O'Hara, 69 Or. 519, 139 Pac. 743, L. R. A. 1917C, 944, Ann. Cas. 1916A, 217; Simpson v. O'Hara, 70 Or. 261, 141 Pac. 158; Williams v. Evans, 139 Minn. 32, 165 N. W. 495, 166 N. W. 504, L. R. A. 1918F, 542; State v. Crowe, 130 Ark. 272, 197 S. W. 4, L. R. A. 1918A, 567, Ann. Cas. 1918D, 460; Larsen v. Rice, 100 Wash. 642, 171 Pac. 1037; Spokane Hotel Co. v. Younger, 113 Wash. 359, 194 Pac. 595; Holcombe v. Creamer, 231 Mass. 99, 120 N. E. 354, and Poye v. State, 89 Tex. Cr. R. 182, 230 S. W. 161. This fact is worthy of serious consideration. Halter v. Nebraska, 205 U. S. 34, 40, 27 Sup. Ct. 419, 51 L. Ed. 696, 10 Ann. Cas. 525.

From the foregoing survey I cannot doubt that this act has a substantial relation to its expressed object. I now come to the other element of the problem: Is the act a palpable invasion of rights secured by the fundamental law?

In variant forms of argument it is urged that the act is invalid because it interferes with freedom of contract. That it does so must be conceded, but that is not fatal. Every statute exerting the police power. interferes with freedom of contract. Under such a statute persons are forbidden to contract to do certain things which they were free to do before its enactment. If it be correct that the statute is void on that ground, there would be no room for the play of the police power. But, obviously, it cannot be correct. "There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." The right to make contracts "is subject also, in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals, and welfare of those subject to its jurisdiction." Chicago, Burlington & Quin-

cy R. R. Co. v. McGuire, 219 U. S. 549, 567, 568, 31 Sup. Ct. 259, 262 (55 L. Ed. 328).

In German Alliance Insurance Co. v. Kansas, 233 U. S. 389, 409, 34 Sup. Ct. 612, 618 (58 L. Ed. 1011, L. R. A. 1915C, 1189), Mr. Justice McKenna, speaking of the dissenting opinion of Mr. Justice Brewer in Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, wrote:

"Every consideration was adduced, based on the private character of the business regulated, and, for that reason, its constitutional immunity from regulation, with all the power of argument and illustration of which that great judge was a master. The considerations urged did not prevail. Against them the court opposed the ever-existing police power in government and its necessary exercise for the public good, and declared its entire accommodation to the limitations of the Constitution. The court was not deterred by the charge (repeated in the case at bar) that its decision had the sweeping and dangerous comprehension of subjecting to legislative regulation all of the businesses and affairs of life and the prices of all commodities."

Therein the learned justice examines many of the prior decisions of the Supreme Court with respect to the police power, and finds that according to them that power, when exercised for the public good, is in "entire accommodation to the limitations of the Constitution."

Many are the instances in which the court has sustained statutes involving a restriction upon freedom of contract. It has approved an act limiting the hours of employment in mines and smelters (Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780); forbidding the sale of cigarettes without license (Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725); requiring the redemption in cash of store orders issued in payment of wages (Knoxville Iron Co. v. Harbison, 183 U. S. 13, 22 Sup. Ct. 1, 46 L. Ed. 55); prohibiting contracts for options to sell or buy grain (Booth v. Illinois, 184 U. S. 425, 22 Sup. Ct. 425, 46 L. Ed. 623); permitting an individual to condemn property for the purpose of obtaining water for his land (Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171); and forbidding the employment of women in laundries more than 10 hours a day (Muller v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957). In each of these cases the right of private contract was involved, but that did not deter the court from sustaining the statutes.

Between the sphere of constitutional guaranties and that of the police power there is a dividing line, but the courts have purposely refrained from pointing out just where it lies. Jacobson v. Massachusetts, supra, 197 U. S. 11, 25, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765. "It is always easier to determine whether a particular case comes within the general scope of the power than to give an abstract definition of the power itself which will be in all respects accurate. No one denies, however, that it extends to all matters affecting the public health or the public morals." Stone v. Mississippi, 101 U. S. 814, 818 (25 L. Ed. 1079). Correctly understood, the constitutional guaranties against deprivation of liberty or property without due process of law protect only against arbitrary deprivation or arbitrary spoliation. In the leading case of Barbier v. Connolly, 113 U. S. 27,

31, 5 Sup. Ct. 357, 359 (28 L. Ed. 923), the court considered the scope of the Fourteenth Amendment. It said:

"But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity."

In Miller v. Wilson, 236 U. S. 373, 380, 35 Sup. Ct. 342, 343 (59 L. Ed. 628, L. R. A. 1915F, 829), Mr. Justice Hughes, speaking for the court, said:

"As the liberty of contract guaranteed by the Constitution is freedom from arbitrary restraint—not immunity from reasonable regulation to safeguard the public interest—the question is whether the restrictions of the statute have reasonable relation to a proper purpose."

Supporting the same doctrine are Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, Muller v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957, Riley v. Commonwealth of Massachusetts, 232 U. S. 671, 34 Sup. Ct. 469, 58 L. Ed. 788, and Bosley v. McLaughlin, 236 U. S. 385, 35 Sup. Ct. 345, 59 L. Ed. 632.

Even property may be destroyed without compensation through the legitimate exercise of this power without offending against the constitutional guaranty. Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. "No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants." Stone v. Mississippi, 101 U. S. 819, 25 L. Ed. 1079. In the Mugler Case the court, speaking of the Fourteenth Amendment, said:

"* * * And it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." 123 U. S. 665, 8 Sup. Ct. 299, 31 L. Ed. 205.

Other cases to the same effect are New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 672, 6 Sup. Ct. 252, 29 L. Ed. 516; Beer Co. v. Mass., 97 U. S. 25, 32 (24 L. Ed. 989). "That the Fourteenth Amendment was not intended to and does not strip the states of the power to exert their lawful police authority is settled, and requires no reference to authorities." Thus spoke the learned Chief Justice in Louisville & Nashville Railroad v. Melton, 218 U. S. 36, 52, 30 Sup. Ct. 676, 680 (54 L. Ed. 921, 47 L. R. A. [N. S.] 84).

While it is true that it was the Fourteenth Amendment, and not the Fifth Amendment, which was under consideration in many of the decisions which I have just referred to, what is said therein is as applicable to the one as to the other. Indeed, it is so stated in Barbier v. Connolly, supra, 113 U. S. 31, 5 Sup. Ct. 357, 28 L. Ed. 923.

Repeatedly the Supreme Court has upheld statutes limiting the hours of labor on the footing that excessive hours interfere injuriously with the health of those who are compelled to practice them. Holden v. Hardy, supra, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780; Muller

v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957; Riley v. Commonwealth of Mass., supra, 232 U. S. 671, 34 Sup. Ct. 469, 58 L. Ed. 788; Miller v. Wilson, supra, 236 U. S. 373, 35 Sup. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829, and Bosley v. McLaughlin, 236 U. S. 385, 35 Sup. Ct. 345, 59 L. Ed. 632. The first case related to men engaged in mining. Does not a wage which will provide sufficient food have as close a relation to health as hours of labor do? I think so.

Congress found an evil existed. The workers, by reason of the law of competition, were unable to remove it. They were compelled to submit or go without work. "Necessitous. men," says Lord Chancellor Nothington, "are not, truly speaking, free men." Vernon v. Bethell, 2 Eden, 110, 113. Congress alone could apply the remedy. There was a time when it was a principle of constitutional construction that the whole community had no right of control over the individual beyond the minimum necessary to keep the peace. Everything else was to be left to the free contract of a free man. "Happily," says Dean Pound, "this idea passed its meridian in our constitutional law at the end of the last century." Spirit of the Common Law, 49.

Suppose the women engaged in the different lines covered by the order in question were each paid only $6 per week, while $16.50 per week was necessary to feed, clothe, and shelter each, and their employers could afford to pay $16.50 a week, but would not pay it, because under the law of supply and demand women had to work for that wage or starve, should not the government have the power, in the interests, of the community, if not of humanity, to interpose and compel the payment of a living wage? The choicest function of government is to protect the weak against the unrighteous acts of those who are strong economically or physically. Would it be just to permit an employer to exact from a woman $16.50 worth of work for $6 simply because he had the power to do so? I think not.

Congress in pursuance of the Constitution (article 1, § 8) has authority to pass a protective tariff law for the purpose of guarding industries against foreign competition, to the end that their owners may be able to exact higher prices for the output of their industries than they could secure if foreign competition was permitted. This authority is not conferred specifically, but under the power to collect taxes, duties, imposts, and excises, and to regulate commerce with foreign nations it is inferred. Arnold v. United States, 147 U. S. 494, 13 Sup. Ct. 406, 37 L. Ed. 253; United States v. American Express Co. (C. C.) 177 Fed. 735. Unless it be dangerous to intrust Congress with the power to increase the price which manufacturers may charge for their commodities by restricting competition, it should not be dangerous to clothe it with power to reasonably increase the wages of working women and girls by the same process.

The majority condemns the act as economically and socially unwise, and warns wage-earners against its viciousness. In the record there is absolutely no fact to justify this. Moreover, it is in the teeth, as I have shown, of the judgment of 13 states, of 5 foreign nations, of 8 Canadian provinces, of the Merchants' & Manufacturers' Association of this

city, of practically every member of the Congress which passed the act—in a word, of every one who has studied the matter, if we are to be governed by the record, and we should be. But suppose the act is unwise; what has that to do with its constitutionality? What Congress does may be wise and yet unconstitutional. Child Labor Case—Bailey et al. v. Drexel Furniture Co., 258 U. S. ——, 42 Sup. Ct. 449, 66 L. Ed. ——. Courts are not vested with the power to measure the validity of a legislative act by the wisdom or lack of wisdom it may disclose, and if they assume to do so they are guilty of a usurpation forbidden by the Constitution. Otis v. Parker, ante.

It is argued that in order that a fair minimum wage may be fixed it is necessary to ascertain the cost of rent, clothes, food, and recreation. Not at all. As well say that a railroad rate cannot be determined by the Interstate Commerce Commission until the price of iron, steel, land, coal, clothing, etc., used by the railway, has been found. No such course has ever been followed in fixing a railroad rate, nor is it necessary that it should be. The body charged with fixing the rate may assume that the prevailing prices with respect to the other things are reasonable, in the absence of any showing to the contrary. But, again, this matter is not pertinent, since it goes to the method of doing the thing, not the power to do it.

Fault is found with the act because, as charged, it is a price or wage-fixing measure. But where, I ask, is there anything in the Constitution which specifically prohibits Congress from fixing prices or wages? We must not allow ourselves to be misled by mere words, for they are "but skins of thought." What the law concerns itself about is the thought—the substance. Congress has the authority under the police power, when legislating for the District, and it is its duty, to promote the general welfare of the community; and if in pursuing this authority it becomes necessary to fix a minimum wage or price of a commodity, it may do so. The validity of the action depends upon the conditions existing. As was said by Mr. Justice Holmes, speaking for the court, in Schenck v. United States, 249 U. S. 47, 52, 39 Sup. Ct. 247, 63 L. Ed. 470, it may be no harm to raise a false alarm of fire on the prairies, but a very grave offense to do so in a crowded theater. So with the exercise of the police power. Whether it may or may not be exerted is to be answered by the facts of the situation, no matter by what name they are known. The price-fixing features of the Ball Rent Act (Block v. Hirsh, supra) and of the New York Rent Acts, Laws N. Y. 1920, cc. 942–953 (Levy, etc. v. Siegel, supra) were sustained because the general welfare at the time demanded their enactment, just as the protection of the morals and health of women called for the passage of the act we are reviewing. An endeavor is made to differentiate those acts from the present one by saying they were brought into existence by an emergency. But this is only another way of saying that the facts—the emergency—justified the exertion of the power which resulted in their enactment. When those facts disappear, the right to exert the power may also disappear; but the power will remain. There is a wide distinction between the existence of the power and

the constitutional right to use it. This distinction is completely lost sight of by those who oppose the act.

In a broad sense the act is not a wage-fixing measure, but a measure to prevent the confiscation of a working woman's labor by those who have the economic power to do it.

It would extend this opinion far beyond a reasonable length if I were to review the decisions of the Supreme Court cited in the majority opinion, yet I cannot refrain from saying that a careful examination of them will disclose that they support the views I have here expressed. Take, for example, Muller v. Oregon. It affirmed the constitutionality of an act fixing the hours of labor for women in laundries, etc. The majority quotes an excerpt from it to the effect that the general right to contract in relation to one's business is part of the liberty of the individual protected by the Fourteenth Amendment, but fails to give the concluding part of the sentence, which reads:

"Yet it is equally well settled that this liberty is not absolute and extending to all contracts, and that a state may, without conflicting with the provisions of the Fourteenth Amendment, restrict in many respects the individual's power of contract." 208 U. S. 421, 28 Sup. Ct. 326, 52 L. Ed. 551, 13 Ann. Cas. 957.

This is precisely what I contend for, and shows conclusively the decision is not an authority against the validity of the act.

While the record does not tell that the appellant Lyons lost her position by reason of the enforcement of the act, if she did, as stated by the majority, some one else secured it at a better wage. This is not a calamity which should condemn the statute.

Much was said during the argument at the bar to the effect that, if this statute is sustained, it will lead to sovietism, etc. When statutes having that effect come up for judgment we shall deal with them. It is no part of our duty to engage in speculation concerning them now. "Our present duty," as said by Mr. Justice McKenna, "is to pass upon the statute before us, and if it has been enacted upon a belief of evils that is not arbitrary, we cannot measure their extent against the estimate of the legislature. McLean v. Arkansas, 211 U. S. 539." Tanner v. Little, 240 U. S. 369, 385, 36 Sup. Ct. 379, 384 (60 L. Ed. 691). See, also, Central Lumber Co. v. South Dakota, 226 U. S. 157, 160, 33 Sup. Ct. 66, 57 L. Ed. 164, and Purity Extract Co. v. Lynch, 226 U. S. 192, 204. 205, 33 Sup. Ct. 44, 57 L. Ed. 184.

Concerning sovietism, however, I may say that I do not think the upholding of the act would have the tendency claimed. On the contrary, I am convinced the opposite effect would be produced, because the decision would demonstrate that this government, as framed by the Fathers, has ample power, and those invested with that power have the disposition, to protect the weak against the strong by administering justice to both. If the power did not exist, and the government could not interfere, but would have to stand supinely by while wrong dominated right, there might be some basis for the contention that a change is necessary in our institutions; but with the recognition of the power, virile and efficient, the contention loses all force it might otherwise have.

It appears to me conclusively that a minimum wage has a real and substantial relation to the health and morals of women and minor girls who work, and that Congress, by providing for the establishment of such a wage in the manner outlined in the statute, has not acted arbitrarily or spoliatively, but clearly within the limits of the police power with which it is intrusted.

Mr. Justice Stafford, after declaring he concurred in the opinion of the court as written by me in June, 1921, said in effect that the Minimum Wage Law for women, the constitutionality of which is challenged in these cases, is an act passed in the public interest, and by way of protection to a class which might reasonably be considered as needing protection, viz., the women who must labor in order to live. It would seem that the right of this class to live on a barely decent level, and the right of the public to have them so live, should outweigh the right of those who do not need to work in order to live, and who therefore are merely asserting a right to earn money and thereby accumulate property. If a woman is willing to work for less than a decent living wage it must be because she has other means of livelihood, or because she is willing to live below that level. She ought not to be allowed to live below that level, if that means that the woman beside her, who is trying to live decently, will be dragged down with her. If she has other means of livelihood, then she ought not so to compete with those who have none that they will be reduced to squalor or required to resort to immoral means of living. The public interest in the purposes of the act is too obvious to call for explanation or comment. Congress has made this law with the declared purpose of protecting and promoting the public health, morals, and welfare, by making it illegal to employ women at a wage which will not afford them a decent living. The machinery provided is for the purpose of ascertaining the lowest decent living wage. I must assume that such ascertainment is possible, and that in a given case it has been reached, unless it is alleged and shown that the action taken is arbitrary, confiscatory, or otherwise high-handed; and no such allegation is here made, although the case presented appears to be one of those cases of individual hardship which are possible under any law.

For the reasons given, I dissent.